1  Royal L. Hardy
   # 83346022
2  FCI OAKDALE
   FEDERAL CORRECTIONAL INSTITUTION
3  PO BOX 5000
   OAKDALE, LA 71463

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT

MAY 07 2008

at ___ o'clock and ___ min. ___ M.
SUE BEITIA, CLERK

7                UNITED STATES DISTRICT COURT
                 _____

9  UNITED STATES OF AMERICA,        )  Case No.: CR-02-00133-ER/BMK
            Plaintiff,              )
10         vs.                      )  Points and Authorities on
                                    )
11                                  )  FEDERAL JURISDICTION
            Defendant               )
12 Royal L. Hardy                   )
                                    )
13                                  )
   _____)
14

15                        **CONTENTS**

16                                                          Page

The Beginning                                                 2
The Origin and Source of Federal Jurisdiction                3
The Early Judiciary Builds Upon our Foundation               8
Twentieth Century Jurisdictional Decisions                  13
Jurisdictional Summary                                      17
Federal Recognition of the above Documented Facts           19
Federal Territorial Jurisdiction                            20
Federal Criminal Jurisdiction                               22
Court Must Examine its Own Jurisdiction                     25
State Decisions Regarding Federal Jurisdiction              26
Proof Requirements in Every Federal Criminal Prosecution    27
The Sum Total of Federal Jurisdictional Requirements        28
Commerce Clause                                             30
Personal Jurisdiction                                       32
Subject Matter Jurisdiction                                 32
Legislative (subject-matter) Jurisdiction                   34
Jurisdiction of Federal Courts                              37
In Conclusion                                               48

## MEMORANDUM OF LAW
## FEDERAL JURISDICTION

Tragically, history will record that in the closing years of the twentieth century, the people of these States" endured a Constitutionally dysfunctional "United States" government. They forgot the lessons of history, and failed to heed what their founders wrote for their "learning".

## THE BEGINNING

Two centuries and a score of years after the inception of the American "Experiment", our nation finds itself embroiled in a crisis of inestimable proportions. As a people divided, we stand at a crossroads of reform or revolution. Only by a careful and sincere reevaluation of our moral, spiritual, and philosophic roots can we hope to avoid a mortal confrontation, terrible and long lasting in its effects. The Federal Judiciary has sown the winds of error, and is currently in the eye of this day's whirlwind of confrontation. Hopefully, there remain enough principled jurists and legislators to redeem their once honorable professions. Recently, our Supreme Court has stated:

> "The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." **New York v. United States**, 112 S. Ct. 2408, 2431, 120 L Ed 2d 120, 154 (1992).

> "If anything, the 'wrong turn' was the Court's dramatic departure in the 1930's from a century and a half of precedent", **United States v. Lopez**, 115 S. Ct. 1624, 57 CrL 2033, 2047 (1995).

- 2

". . .a healthy balance of power between the States and Federal Government will reduce the risk of <u>tyranny and abuse</u>. . ".., [Emphasis added] **New York v. United States**, supra., at 154.

Broadly speaking, under our <u>two</u> separate and distinct <u>jurisdictional systems</u>, "State Jurisdiction" encompasses the legislative power to regulate, control and govern, real and personal property, individuals, and enterprises within the territorial boundaries of any particular State. In contrast, Federal jurisdiction is extremely limited, lawfully exercised only in areas external to State legislative power and territory, and specifically "delegated" by the Constitution. Even in commerce, as the court said in **United States v. Morrison**, 529 US 598, 618 (2000), "the regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels or goods involved in interstate commerce has always been the province of the states". See, e.g., **Cohens v. Virginia**, 6 Wheat 264 (1821). In spite of the clarity of this simple principle, the line of demarcation between these two **mutually exclusive** jurisdictions, and the lawful extent and reach of each of them has become blurred and confused. This dangerous confusion has been due to popular misconceptions and a lack of understanding of our historic Constitutional roots. This tragic situation has been fostered by efforts expended by the Federal government to conceal one of it's major weaknesses, spearheaded by the Department of Justice, and aided an abetted by a too willing judiciary. Only by resorting to our history and "honorable" case law can this obfuscation and sophistry be clarified, and the two distinct jurisdictions be readily seen. Historically, when the "unlearned" called out, "The emperor has no clothes!", the "learned" were quick to scream, "Fraud!, Liar!, Not so!", but,. . .the facts speak for themselves, so let us now examine the facts.

## THE ORIGIN AND SOURCE OF FEDERAL JURISDICTION

The original thirteen colonies of America were separately established by charters from the English Crown. Outside of the common bond of each being a dependency and colony of the mother country, England, the colonies were not otherwise united. Each colony had it's own governor, legislative assembly and courts, and each was governed separately and independently by the English Parliament.

The political connections of the separate colonies to the English Crown and Parliament descended to an unhappy state of affairs as the direct result of Parliamentary Acts adopted in the late 1760's and early 1770's, in order to repay England's cost of aiding the colonists in the French and Indian War. Due to the real and perceived dangers caused by these various Acts, the First Continental Congress was convened by representatives of the several colonies in October of 1774, the purpose of which was to submit a petition of grievances to the English Parliament and Crown. In the "Declaration and Resolves" of the First Continental Congress, dated October 14, 1774, the colonial representatives labeled these Parliamentary Acts of which they complained, as "impolitic, unjust, and cruel, as well as unconstitutional, and most dangerous and destructive of American rights", and the purpose of which were designs, schemes and plans "which demonstrate a system formed to enslave America." They too stood at a crossroads of reform or revolution, revolution being in the formative stages absent conciliation between the mother country and her colonies. Between October of 1775 and the middle of 1776, each of the colonies separately severed their ties and relations with England, and several even adopted Constitutions for the newly formed **independent** States. By July of 1776, the exercise of English authority in any and all colonies was not recognized to any great degree. The formal **Declaration of Independence** was the captone of this actual separation of the colonies from England.

1    The legal effect of the **Declaration of Independence** was to make each new State a

2    separate and independent <u>Sovereign</u>, over which there was no other government of superior

3    power or "Jurisdiction". This was clearly shown in **M'Ilvaine v. Coxe's Lessee**, 8 US (4

4    Cranch) 209 (1808), where it was held:

5
6    "This opinion is predicated upon a principle which is believed to be undeniable, that the
     several states which composed this Union, so far at least as regarded their municipal
     regulations, become entitled; from the time when they declared themselves independent,
7    to all the rights and powers of sovereign states, and that they did not derive them from
     concessions made by the British king. The treaty of peace contains a recognition of their
8    independence, not a grant of it. From hence it results, that the laws of the several state
     governments were the laws of sovereign states, and as such were obligatory upon the
9    people of such state, from the time they were enacted,"4 Cranch, at 212.

10
     Additional authority of similar expression is found in **Harcourt v. Gaillard**, 25 US (12
11
     Wheat.) 523 (1827), where the Court stated:
12
13   "There was no territory within the United States that was claimed in any other right than
     that of some one of the confederated states; therefore, there could be no acquisition of
     territory made by the United States distinct from, or independent of some one of the
14   states,"
     and,
15
     "Each declared itself sovereign and independent, according to the limits of its territory,"
16
     and,
17
     "[T]he soil and sovereignty within their acknowledged limits were as much theirs at the
18   declaration of independence as at this hour," 12 Wheat., at 526, 527.

19
     Thus, unequivocally, in July of 1776, the new States possessed all sovereignty, power,
20
21   and **jurisdiction**, over all the soil and persons in their respective territorial limits.

22   This condition of supreme sovereignty and jurisdiction of each State over all property and

23   persons within the borders thereof continued notwithstanding the adoption of the **Articles of**

24   **Confederation**, wherein in **Article II** it was expressly stated:

25
     "Each state retains its sovereignty, freedom, and independence, and every Power,
     Jurisdiction and right, which is not by this confederation expressly delegated to the
     United States, in Congress assembled."

- 5

As the history of the confederation government has shown, each State was indeed sovereign and independent to the degree that it made the central government created by the confederation fairly ineffectual. These defects of the confederation government strained the relations between and among the States, and the remedy chosen was the calling of a constitutional convention.

The representatives assembled in Philadelphia in May of 1787. The Constitutional convention met for the primary purpose of improving the commercial relations among the States, although the product of the Convention produced more than was intended. However, **no intention was demonstrated for the States to surrender in any degree the jurisdiction so possessed by the States at that time**. Indeed, the Constitution as finally drafted, continued the same territorial jurisdiction of the States as existed under the **Articles of Confederation**. The essence of this retention of State jurisdiction is embodied in **Article I, Section 8, Clause 17** of the **U.S. Constitution**, which reads as follows:

> "To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular Sates, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

The reason for the inclusion of this clause in the Constitution was, and is, obvious. Under the **Articles of Confederation**, the States retained full and complete jurisdiction over lands and persons within their borders. The Congress under the **Articles** was merely a body which represented and acted as agents of the separate States for external affairs, and had no jurisdiction within the States. This defect within the **Articles** made the Confederation Congress totally dependent upon any given State for protection, and this dependency did in fact cause

embarrassment for that Congress. During the Revolutionary War, while the Congress met in Philadelphia, a body of mutineers from the continental Army surrounded the Congress and chastised and insulted the members thereof. The governments of both Philadelphia and Pennsylvania proved themselves powerless to remedy the situation, and the Congress was forced to flee first to Princeton, New Jersey and finally to Annapolis, Maryland, [see **Fort Leavenworth R. Co.v. Lowe**, 114 US 525, 529 (1885)]. Thus, this clause was inserted into the Constitution to give jurisdiction to Congress over its capital, and such other places as Congress might purchase for forts, magazines, arsenals, and other needful buildings <u>wherein the State ceded jurisdiction of such lands to the federal government</u>. Except in <u>those specific areas</u>, this clause of the Constitution did not operate to cede further jurisdiction to the federal government, with the result that <u>jurisdiction over un-ceded areas remained with the States</u> **exclusively**.

While there had been no real provisions in the Articles which permitted the Confederation Congress to acquire property and possess <u>exclusive jurisdiction</u> over such property, the above clause filled an essential need by permitting the federal government to acquire land for the seat of government and other purposes from certain of the States. Such possessions were deemed essential to enable the United States to perform the powers conveyed by the constitution, and a cession of lands by any particular State would grant exclusive jurisdiction of such lands to Congress. **The Federalist-No. 43**, gave an excellent explanation of the reasons for the necessity of this clause in the Constitution:

"The indispensable necessity of complete authority at the seat of government carries its own evidence with it. It is a power exercised by every legislature of the Union, I might say of the world, by virtue of its general supremacy. Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy. This consideration has the more weight as the gradual accumulation of public improvements at

the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence. The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature. And as it is to be appropriated to this use with the consent of the state ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession will be derived from the whole people of the State in their adoption of the Constitution, every imaginable objection seems to be obviated. The necessity of a like authority over forts, magazines, etc., established by the general government, is not less evident. The public money expended on such places, and the public money deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the States concerned in every such establishment."

## THE EARLY JUDICIARY BUILDS UPON OUR FOUNDATION

Since the time of the ratification and implementation of the present **United States Constitution**, the U.S. Supreme Court and all lower courts have had many opportunities to construe and apply the above provision of the Constitution. The essence of these endless decisions is that the "States", of this nation, have "EXCLUSIVE JURISDICTION" of property and persons located within their borders, excluding such lands and persons residing thereon which have been ceded to the "United States".

One of the earliest decisions on this foundational point was **United States v. Bevans**, 16 US (3 Wheat.) 336 (1818), which involved a federal prosecution for a murder committed on board the Warship, Independence, anchored in the harbor of Boston, Massachusetts. The defense complained that only the State had jurisdiction to prosecute and argued that the federal Circuit Courts had no jurisdiction of this crime supposedly committed within the federal

government's admiralty jurisdiction.  In argument before the Supreme Court, counsel for the

United States admitted as follows:

> "The exclusive jurisdiction which the United States have in forts and dockyards ceded to them, is derived from the express assent of the states by whom the cessions are made.  It could be derived in no other manner; because without it, the authority of the state would be supreme and exclusive therein," 3 Wheat., at 350-51.

In holding that the State of Massachusetts had jurisdiction over the crime, the Court held:

> "What, then, is the extent of jurisdiction which a state possesses?  We answer, without hesitation, the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power," 3 Wheat., at 386-87.

> The article which describes the judicial power of the United States is not intended for the cession of territory or of general jurisdiction. . . .Congress has power to exercise exclusive jurisdiction over this district, and over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.

> It is observable that the power of exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be the free act of the states.  It is difficult to compare the two sections together, without feeling a conviction, not to be strengthened by any commentary on them, that, in describing the judicial power, the framers of our constitution had not in view any cession of territory; or, which is essentially the same, of general jurisdiction," 3 Wheat., at 388.

Thus, in **Bevans**, supra., the Court recognized the principle that federal jurisdiction

extends only over the areas wherein it possesses the power of "exclusive legislation", and this is

a foundational principle incorporated into all subsequent decisions regarding the extent of federal

jurisdiction.  **Any contrary decision would destroy the purpose, intent, and meaning of the**

**entire U.S. Constitution, and constitute "self-evident" proof of an intent upon tyranny**

**toward the citizens of these "United States".**

The decision in **Bevans**, supra., was closely followed by decisions made in two state

courts and one federal court within the next two years.  In **Commonwealth v. Young,** Brightly,

N.P. 302 (Pa., 1818), the supreme Court of Pennsylvania was presented with the issue of whether

lands owned by the United States for which Pennsylvania had never ceded jurisdiction had to be

sold pursuant to state law.  In deciding that the state law of Pennsylvania exclusively controlled

this sale of federal land, the Court held:

> "The legislation and authority of congress is confined to cessions by particular states for
> the seat of government, and purchases made by consent of the legislature of the state, for
> the purpose of erecting forts.  The legislative power and exclusive jurisdiction remained
> in the several states, of all territory within their limits, not ceded to, or purchased by,
> congress, with the assent of the state legislature, to prevent the collision of legislation and
> authority between the United States and the several states," Id., at 309.

A year later, the Supreme Court of New York was presented with the issue of whether the

State of New York had jurisdiction over a murder committed at Fort Niagara, a federal fort.  In

**People v. Godfrey**, 17 Johns. 225 (N.Y., 1819), that court held that the fort was subject to the

jurisdiction of the State since the lands thereupon had not been ceded to the United States.  The

rationale of it's opinion stated:

> "To oust this state of its jurisdiction to support and maintain its laws, and to punish
> crimes, it must be shown that an offense committed within the acknowledged limits of
> the state, is clearly and exclusively cognizable by the laws and courts of the United
> States.  In the case already cited, Chief Justice Marshall observed, that to bring the
> offense within the jurisdiction of the courts of the union, it must have been committed out
> of the jurisdiction of any state; it is not (he says), the offense committed, but the place in
> which it is committed, which must be out of the jurisdiction of the state," 17 Johns., at
> 233.

The case relied upon by this court was **United States v. Bevans**, supra.  At about the

same time that the New York Supreme Court rendered it's opinion in **Godfrey**, supra., a similar

fact situation was before a federal court, the only difference being that the murder committed in

the case occurred on land which had been ceded to the United States.  In **United States v.

Cornell**, 25 Fed. Cas. 646, No. 14,867 (C.C.D.R.I., 1819), the court held that the case fell within

federal jurisdiction, describing such jurisdiction as follows:

> "But although the United States may well purchase and hold lands for public purposes,
> within the territorial limits of a state, this does not of itself oust the jurisdiction or
> sovereignty of such State over lands so purchased.  It remains until the State has
> relinquished its authority over the land either expressly or by necessary implication.

> When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of Congress, and the State jurisdiction is completely ousted," Id., at 648.

Almost 18 years later, the U.S. Supreme Court was again presented with a case involving the distinction between State and federal jurisdiction. In **New Orleans v. United States**, 35 US (10 Pet.) 662 (1836), the United States claimed title to property in New Orleans likewise claimed by the city. After holding that title to the subject lands was owned by the city, the Court addressed the question of federal jurisdiction and stated:

> "Special provision is made in the Constitution for the cession of jurisdiction from the States over places where the federal government shall establish forts or other military works. And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction," 10 Pet., at 737.

In **New York v. Miln**, 36 US (11 Pet.) 102 (1837), the question before the Court involved the attempt by the City of New York to assess penalties against the master of a ship for his failure to make a report as to the persons his ship brought to New York. As against the master's contention that the act was unconstitutional and that New York had no jurisdiction in the matter, the Court held:

> "If we look at the place of its operation, we find it to be within the territory, and, therefore, within the jurisdiction of New York. If we look at the person on whom it operates, he is found within the same territory and jurisdiction," 36 US, at 133.

> "They are these: that a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States. That by virtue of this, it is not only the right, but the bounden and solemn duty of a State, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem to be conductive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and **exclusive**," [Emphasis added] 36 US, at 139.

Some eight years later, in **Pollard v. Hagan**, 44 US (3 How.) 212 (1845), the question of federal jurisdiction was once again before the Court. This case involved a contest of the title to real property, with one of the parties claiming a right to the disputed property via a U.S. patent; the lands in question were situated in Mobile, Alabama, adjacent to Mobile Bay,. In discussing the subject of federal jurisdiction, the Court held:

> "We think a proper examination of this subject will show that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Alabama or any of the new States were formed," 44 US, at 221.

> "[Because, the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in the cases in which it is expressly granted," 44 US, at 223.

> "Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law," 44 US, at 228-29.

Possibly the best known and most succinctly states case regarding the subject of federal jurisdiction is **Fort Leavenworth R. Co. v. Lowe**, 114 US 525, 5 S.Ct. 995 (1885), which sets forth the law on this point fully. There, the railroad company property which passed through the Fort Leavenworth federal enclave was being subjected to taxation by Kansas, and the company claimed an exemption from state taxation. In holding that the railroad company's property could be taxed, the Court carefully explained federal jurisdiction within the States:

> "The consent of the states to the purchase of lands within them for the special purposes named, is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion. Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private individuals," 114 US, at 531.

Thus, the cases decided within the 19th century clearly disclosed the extent and scope of both State and federal jurisdiction. In essence, these cases among endless others, hold that the

jurisdiction of any particular State is coextensive with it's borders or territory, and all persons and property located or found therein are subject to such jurisdiction; State jurisdiction being superior. Federal jurisdiction results only from a conveyance of State jurisdiction, to the federal government, for lands owned or otherwise possessed by the federal government, and thus federal jurisdiction is extremely limited in nature, scope, and fact. Remember also, that there is no federal jurisdiction if there be no grant or cession of jurisdiction by the State, to the federal government. Clearly, therefore, **"federal territorial jurisdiction" exists only in Washington, D.C., the federal enclaves within the States, and the territories and possessions of the "United States"**, any holding to the contrary simply constitution "self-evident" proof of intent upon tyranny and abuse,. . . .;

> ". . .a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse.. .", **New York v. United States**, supra., at 154 (1992) [Emphasis added].

> ". . .the Constitution divides authority between federal and state governments for the protection of individuals," **New York v. United States**, Id, at 154.

### TWENTIETH CENTURY JURISDICTIONAL DECISIONS

The previously established principles of jurisdiction, well settled in the 19th century, continue their vitality today, with only one minor exception. In the 19th century, the cessions of jurisdiction by States to the federal government were by legislative acts which typically ceded full jurisdiction to the federal government, thus placing into the hands of the federal government the troublesome problem of dealing with and governing scattered, localized federal enclaves which has been totally surrendered by the States. With the advent in the 20th century of large federal works projects and national parks, the problems regarding management of these areas by the federal government were magnified. During the 19th century, it was held that if a State

ceded jurisdiction to the federal government, the cession granted full and complete jurisdiction.

However, with ever increasing numbers of separate tracts of land falling within the jurisdiction

of the federal government in the 20th century, it has been determined by both federal and State

officials, that the States should retain greater control over these ceded lands, and the courts have

acknowledged the constitutionality of varying degrees of state jurisdiction and control over lands

so ceded.

One of the early cases to acknowledge the proposition that a State could retain a degree

of jurisdiction over property ceded to the federal government was **Surplus Trading Co. v.**

**Cook**, 281 US 647, 50 S.Ct. 455 (1930).  In this case, a state attempt to assess an ad valorem tax

on Army blankets located within a federal army camp was found invalid and beyond the State's

jurisdiction.  However, in regards to the proposition that a State could make a qualified cession

of jurisdiction to the federal government, the Court held:

> "[T]he state undoubtedly may cede her jurisdiction to the United States and may make
> the cession either absolute or qualified as to her may appear desirable, provided the
> qualification is consistent with the purposes for which the reservation is maintained and
> is accepted by the United States.  And, where such a cession is made and accepted, it will
> be determinative of the jurisdiction of both the United States and the state within the
> reservation," 281 US, at 651-52.

Two cases decided in 1937 by the U.S. Supreme Court further clarify the constitutionality

of a reservation of any degree of state jurisdiction over lands ceded to the jurisdiction of the

United States.  In **James v. Dravo Contracting Company**, 302 US 134, 58 S.Ct. 208 (1937),

the State of West Virginia sought to impose a tax upon the gross receipts of the company arising

from a contract which it had made with the United States to build some dams on rivers.  One of

the issues involved in this case was the validity of the state tax imposed on the receipts derived

by the company from work performed on lands to which the State had ceded "concurrent"

jurisdiction to the United States.  In the Court's opinion, it held that a State could reserve and

- 14

qualify any cession of jurisdiction for lands owned by the United States; since the State had done

so here, the Court upheld this part of the challenged tax notwithstanding a partial cession of

jurisdiction to the U.S.

A similar result occurred in **Silas Mason Co. v. Tax Commission of State of Washington**, 302 US 186, 58 S.Ct. 233 (1937). Here, the United States was undertaking the

construction of several dams on the Columbia River in Washington, and had purchased the lands

necessary for the project. Silas Mason obtained a contract to build a part of the Grand Coulee

Dam, but filed suit challenging the Washington income tax when the State sought to impose such

tax on the contract proceeds. Mason's argument that the federal government had exclusive

jurisdiction over both the lands and such contract was not upheld by either the Supreme Court of

Washington or the U.S. Supreme Court. The latter Court held that none of the lands owned by

the U.S. were within it's jurisdiction and thus Washington clearly had jurisdiction to impose the

challenged tax; see also **Wilson v. Cook**, 327 US 474, 66 S. Ct. 663 (1946).

In 1943, the Supreme Court was again presented with similar taxation and jurisdiction

issues; the facts in these two cases were identical with the exception that one clearly involved

lands ceded to the jurisdiction of the United States. This single difference caused directly

opposite results in both cases. In **Pacific Coast Dairy v. Department of Agriculture of California**, 328 US 285, 63 W.Ct. 628 (1943), the question involved the applicability of state

law to a contract entered into and performed on a federal enclave to which jurisdiction has been

ceded to the United States. During World War II, California passed a law setting a minimum

price for the sale of milk, which law imposed penalties for sales made below the regulated price.

Here, Pacific Coast Dairy consummated a contract on Moffett Field, a federal enclave within the

exclusive jurisdiction of the United States, to sell milk to such federal facility at below the

regulated price.  When this occurred, California sought to impose a penalty for what it perceived

as a violation of state law.  However, the U.S. Supreme Court refused to permit the enforcement

of the California law, holding that the contract was made and performed in a territory outside the

jurisdiction of California and within the jurisdiction of the United States, a place where this law

did not apply.  Thus, in this case, the existence of federal jurisdiction was the foundation for the

ruling.  However, in **Penn Dairies v. Milk Control Commission of Pennsylvania**, 318 US 261,

63 S.Ct. 617 (1943), an opposite result was reached on almost identical facts.  Here,

Pennsylvania likewise had a law which regulated the price of milk and penalized sales of milk

below the regulated price.  During World War II, the United States leased some land from

Pennsylvania for the construction of a military camp; since the land was leased, Pennsylvania did

not cede jurisdiction to the United States.  When Penn Dairies sold milk to the military facility at

a price below the regulated price, the commission sought to impose the penalty.  In this case,

since there was no federal jurisdiction, the Supreme Court found that the state law applied and

permitted the imposition of the penalty.  Thus, these two cases clearly show the different results

which must occur with the presence or in the absence of federal jurisdiction.

A final issue which must be viewed regarding federal jurisdiction involves the issue of

when federal jurisdiction ends, or ceases.  This issue was considered in **S.R.A. v. Minnesota**,

327 US 558, 66 S.Ct. 749 (1946), which involved the power of a State to tax the real property

interest of a purchaser of land sold by the United States.  Here, a federal post office building was

sold to S.R.A. pursuant to a real estate sale contract, which provided that title would pass only

after the purchase price had been paid.  In refuting the argument of S.R.A. that the ad valorem

tax on it's equitable interest in the property was really an unlawful tax on U.S. property, the

Court held:

"In the absence of some such provisions, a transfer of property held by the United States under state cessions pursuant to Article 1, Section 8, Clause 17, of the Constitution would leave numerous isolated islands of federal jurisdiction, unless the unrestricted transfer of the property to private hands is thought without more to revest sovereignty in the states. As the purpose of Clause 17 was to give control over the sites of governmental operations to the United States, when such control was deemed essential for federal activities, it would seem that the sovereignty of the United States would end with the reason for its existence and the disposition of the property. We shall treat this case as though the Government's unrestricted transfer of property to non-federal hands is a relinquishment of the exclusive legislative power," 327 US, at 563-64.

Thus, it appears clearly that once any property within the exclusive jurisdiction of the United States is no longer utilized by that government for governmental purposes, and the title or any interest therein is conveyed to private interests, the jurisdiction of the federal government ceases and jurisdiction once again reverts back to the State.

The above principles regarding the distinction between State and federal jurisdiction continue through today; see **Paul v. United States**, 371 US 245, 83 S.Ct. 426 (1963); and **United States v. State Tax Commission of Mississippi**, 412 US 363, 93 S.Ct. 2183 (1973). Obviously, therefore, what was well settled in the beginning of this Republic of "United States" regarding the extent, scope, and reach of these two separate and distinct jurisdictions, remains unchanged and forms the foundation and basis of the intended smooth workings of State government in conjunction with the federal system. In the absence of these jurisdictional principles, with their clear boundary between the jurisdictions of the States and the federal system, our federal system must either meet it's demise or enlarge itself to encompass a perfect definition of tyranny.

JURISDICTIONAL SUMMARY

Jurisdiction of the States is essentially the same as that possessed by the "States" which were leagued together under the **Articles of Confederation**. The confederated "States" possessed absolute, complete, and full "jurisdiction" over property and persons located within their borders, or "territory". It is fraudulent, and would be hypocritical to assume or argue that these "States", which had absolved and banished the centralized power and "jurisdiction" of the

English Parliament and Crown over them by the **Declaration of Independence**, would shortly thereafter cede comparable power and jurisdiction to the Confederation Congress. They certainly did not, and they closely and jealously guarded their own rights, powers, and "jurisdiction". When the **Articles** were replaced by the **Constitution**, the intent and purpose of the States was to retain their same powers and jurisdiction, with a small concession of jurisdiction to the United States for lands found essential for the operation of, **"that government"**. We must remember, even though provision did not operate to instantly change any aspect of State jurisdiction, it simply permitted its future operation wherein any "State", by it's own volition, might choose to cede jurisdiction to the "United States".

The "States", by adoption of the Constitution, jointly surrendered some 17 "specific, and well defined powers", to the federal Congress, **which related strictly to external affairs of the "States"**. Any single power, or even several powers combined, do not operate in a fashion so as to invade or divest any "State" of its jurisdiction. As against any single "State", the remainder of the "States" under the Constitution, have no right to jurisdiction within the single "State", ....without that "State's" specific consent thereto.

The only provision in the Constitution which permits jurisdiction to be vested in the "United States", is found in **Article I, Section 8, clause 17**, which provides the only mechanism for a voluntary cession of jurisdiction from any "State" to the "United States". Remember, when the Constitution was adopted, the "United States" had jurisdiction over no lands within the "States", possessing jurisdiction only in the lands encompassed in the Northwest Territories. Shortly thereafter, Maryland and Virginia ceded jurisdiction to the "United States" for Washington, D. C.. Thereafter, as time progressed, the "States" at various times ceded jurisdiction to federal enclaves within the "States". Still, at this present day, the territorial

jurisdiction of the "United States" is found only in such ceded areas, which encompass

Washington, D.C., the federal enclaves within the "States", and such territories and possessions

which may be today owned by the "United States".


### FEDERAL RECOGNITION OF THE ABOVE DOCUMENTED FACTS

The prior conclusions are in fact the written opinion of the federal government itself. The

issues are well discussed both historically and in depth, with hundreds of cites, in a publication

of the U. S. Government Printing Office titled **JURISDICTION OVER FEDERAL AREAS**

**WITHIN THE STATES**, and subtitled, "Report of the Interdepartmental Committee for the

Study of Jurisdiction over Federal Areas within the States", published in two volumes, **Part I**,

and **Part II**, in 1956-1957, which report is the definitive treatise on this subject. In **Part II**,

pages 2-6, 41-54, and 105-115 well illustrate that the legislative and territorial jurisdiction of the

federal government is strictly limited and defined. The federal government has no authority to

restrict or compel the activities of the individual in those areas which are outside the said

legislative and territorial jurisdiction thereof, and the federal Courts are limited by and do not

exceed the jurisdictions held by the federal government. Therein, the Committee well stated:

> "The Constitution gives express recognition to but one means of Federal acquisition of
> legislative jurisdiction – by State consent under Article 1, Section 8, Clause 17 ... Justice
> McLean suggested that the Constitution provided the sole mode for transfer of
> jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take
> place," Id., at 41.
> "It scarcely needs to be said that unless there has been a transfer of jurisdiction (1)
> pursuant to clause 17 by a Federal acquisition of land with State consent, or (2) by
> cession from the State to the Federal Government, or unless the Federal Government has
> reserved jurisdiction upon the admission of the State, the Federal Government possesses
> no legislative jurisdiction over any area within a State, such jurisdiction being for
> exercise by the State, subject to non-interference by the State with Federal functions," Id.,
> at 45.

"The federal government cannot, by unilateral action on its part, acquire legislative jurisdiction over any area within the exterior boundaries of a State," Id., at 46.

"On the other hand, while the Federal Government has power under various provisions of the Constitution to define, and prohibit as criminal, certain acts or omissions occurring anywhere in the United States, it has no power to punish for various other crimes, jurisdiction over which is retained by the States under our Federal-State system of government, unless such crime occurs on areas as to which legislative jurisdiction has been vested in the Federal Government," Id., at 107.

Therefore, we see from an abundance of case law, well recognized and buttressed by the aforementioned lengthy and definitive government-authored treatise on these issues, that the jurisdiction of the "United States", is carefully circumscribed and defined as a very precise portion of these "United States of America". The "United States" is only one (1) of the jurisdictions existing in this nation, and is a "foreign jurisdiction" within the territory of the individual "States" wherein exists "exclusive jurisdiction".

## FEDERAL TERRITORIAL JURISDICTION

It is a well established principal of law that, "all federal legislation applies only within the territorial jurisdiction of the United States unless a contrary intent appears,"; see **Caha v. United States**, 152 US 211, 215, 14 S.Ct. 513 (1894); **American Banana Company v. United Fruit Company**, 213 US 347, 357, 29 S.Ct. 511 (1909); **United States v. Bowman**, 260 US 421, 437, 52 S.Ct. 252 (1922); **Blackmer v. United States**, 284 US 421, 437, 52 S.Ct. 252 (1932); **Foley Bros. V. Filardo**, 336 US 281, 285, 69 S.Ct. 575 (1949); **United States v. Spelar**, 338 US 217, 222, 70 S.Ct. 10 (1949); and **United States v. First National City Bank**, 321 F 2d 14 23 (2nd Cir. 1963).

Application of Congressional statutes (Acts of Congress) to the territories is further supported by the courts in cases such as **Commodity Futures Trading Commission v. Nahas**, 738 F. 2d 487 (1984), where the court said, "an important canon of statutory construction teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only

476 F 2d 910, 915 (D.C. Cir. 1973), holding administration of Social Security Act as territorial;

and **Schoenbaum v. Firstbrook**, 268 Fsupp. 385, 392 (S.D.N.Y. 1967), holding securities act as

territorial. The issue was perhaps best stated in **Caha v. United States**, supra., where the

Supreme Court stated as follows:

> "The laws of Congress in respect to those matters do not extend into the territorial limits
> of the states, but have force only in the District of Columbia, and other places that are
> within the exclusive jurisdiction of the national government,", 152 US, at 215.

The "United States" has territorial jurisdiction only in Washington, D.C., the federal

enclaves within the States, and in the territories and insular possessions of the "United States",

wherein the "United States" has exclusive jurisdiction, and this fundamental proposition of law is

fully supported by literally hundreds upon hundreds of cases. In **Bowen v. Johnson**, 97 F 2d

860 (9th Cir. 1938), the question presented was whether jurisdiction over an offense prosecuted

in federal court could be raised in a petition for habeas corpus. The denial of Bowen's petition

was reversed in **Bowen v. Johnson**, 306 US 19, 59 S.Ct. 442 (1939), the Court concluding that

such a jurisdictional challenge could be raised in a habeas corpus petition, and then addressed the

issue. The Court found that the U.S. both owned the property in question and had a State

legislative grant, ceding jurisdiction to the United States, thus there was jurisdiction in the United

States to prosecute Bowen. However, if jurisdiction is not vested in the United States pursuant to

statute, there is no federal jurisdiction, as was found as follows:

> "No jurisdiction existed in United States to enforce federal criminal laws until consent to
> accept jurisdiction over acquired lands have been filed in behalf of United States as
> provided in Title 40 USCS § 255, and fact that state authorized government to take
> jurisdiction was immaterial.", **Adams v. United States**, 319 US 312, 63 S.Ct. 1122, 87 L
> Ed 1421 (1943).

<u>FEDERAL CRIMINAL JURISDICTION</u>

There can be no "lawful" prosecution of a criminal charge in the federal courts absent "federal jurisdiction". In **Kelly v. United States**, 27 F 616 (D. Me. 1885), federal jurisdiction of a manslaughter committed at Fort Popham was upheld when it was shown that the U.S. owned the property where the offense occurred and the State had ceded jurisdiction. In **United States v. Andem**, 158 F 996 (D.N.J. 1908), federal jurisdiction for a forgery offense was upheld on a showing that the United States owned the property where the offense was committed and the state had ceded jurisdiction of the property to the U.S. In **United States v. Penn**, 48 F 669 (E.D.Va. 1880), since the U.S. did not have jurisdiction over Arlington National Cemetery, a federal larceny prosecution was dismissed. In **United States v. Lovely**, 319 F 2d 673 (4th Cir. 1963), federal jurisdiction was found to exist by U.S. ownership of the property and a State cession of jurisdiction. In **United States v. Watson**, 80 F.Supp. 649 649 (E.D.Va. 1948), federal criminal charges were dismissed, the Court stating as follows:

> "Without proof of the requisite ownership or possession of the United States, the crime has not been made out," Id., at 651.

In **Brown v. United States**, 257 F 46 (5th Cir. 1919), federal jurisdiction was upheld on the basis that the U.S. owned the post-office site where a murder was committed and the State had ceded jurisdiction; see also **England v. United States**, 174 F 2d 466 (5th Cir. 1949); **Krull v. United States**, 240 F 2d 122 (5th Cir. 1957); **Hudspeth v. United States**, 223 F 2d 848 (5th) Cir. 1955); and **Gainey v. United States**, 324 F 2d 731 (5th Cir. 1963). In **United States v. Townsend**, 474 F 2d 209 (5th Cir. 1973), a conviction for receiving stolen property was reversed when the court reviewed the record and learned that there was absolutely no evidence disclosing that the defendant had committed this offense within the jurisdiction of the United States. In **United States v. Benson**, 495 F 2d 475, 481 (5th Cir. 1974), in finding federal jurisdiction for a robbery committed at Fort Rucker, the Court states:

"It is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefore,", Id, at 481.

In **United States v. Tucker**, 122 F 518 (W.D.KY. 1903), a case involving an assault committed at a federal dam; and **United States v. Blunt**, 558 F 2d 1245 (6th Cir. 1977), a case involving an assault within a federal penitentiary, jurisdiction was sustained by finding that the U.S. owned the property in question and the state involved had ceded jurisdiction.  In **In Re Kelly**, 71 F 545 (E.D.Wis. 1895), a federal assault charge was dismissed when the court held that the state cession statute in question was not adequate to convey jurisdiction of the property in question to the "United States".  In **Sweeton v. Brown**, 27 F 3d 1162 (6th Cir. 1994), the Court quoted:

"Lack of jurisdiction cannot be waived and jurisdiction cannot be conferred upon a federal court by consent, inaction or stipulation.....A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking", Id, at 1169.

In **United States v. Johnson**, 426 F 2d 1112 (7th Cir. 1970), involving a federal burglary prosecution, federal jurisdiction was sustained upon the showing of U.S. ownership and cession by the State.  Numerous cases from the 8th and 10th Circuits also require the same essential elements to be shown to demonstrate the presence of federal jurisdiction; see **United States v. Heard,** 270 F.Supp. 198 (W.D.Mo. 1967); **United States v. Redstone**, 488 F 2d 300 (8th Cir. 1974); **United States v. Goings**, 504 F 2d 809 (8th Cir. 1974), demonstrating the loss of jurisdiction; **Hayes v. United States**, 367 F 2d 216 (10th Cir. 1966);  **United States v. Carter**, 430 F 2d 1278 (10th Cir. 1970); **Hall v. United States**, 404 F 2d 1367 (10th Cir. 1969); and **Untied States v. Cassidy**, 571 F 2d 534 (10th Cir. 1978).

Of all the circuits, the Ninth Circuit has addressed jurisdictional issues more than any of the circuits.  In **United States v. Bateman**, 34 F 86 (N.D.Cal. 1888), it was determined that the

1   United States did not have jurisdiction to prosecute for a murder committed at the Presidio

2   because California had never ceded jurisdiction; but later, California ceded jurisdiction for the

3   Presidio to the United States, and it was held in **United States v. Watkins**, 22 F 2d 437

4   (N.D.Cal. 1927), that this cession of jurisdiction enabled the U.S. to sustain a murder

5   prosecution; see also **Untied States v. Holt**, 168 F 141 (W.D.Wash. 1909); **United States v.**

6   **Lewis**, 253 F 469 (S.D.Cal. 1918); and **United States v. Wurtzbarger**, 276 F 753 (Dor. 1921).

7   Because the U.S. owned and had a state cession of jurisdiction for Fort Douglas in Utah, it was

8   held that the US. had jurisdiction for a rape prosecution in **Rogers v. Squier**, 157 F 2d 948 (9th

9   Cir. 1946).  Without a cession, the U.S. is without jurisdiction, **State of Arizona v Manypenny**,

10  445 F.Supp. 1123 (D.Ariz. 1977).

11

12                    COURT MUST EXAMINE ITS OWN JURISDICTION

13          The above issue was well addressed not so long ago by the U.S. Supreme Court in

14  **Insurance Corporation of Ireland, Ltd. v. Compagnie des Bauxites de Guinee**, 456 US 694,

15  72 L Ed 2d 492 (1982), wherein the Court stated:

16          "Subject-matter jurisdiction...... is an Art. III as well as a statutory requirement; it
        functions as a restriction on federal power, and contributes to the characterization of the
17      federal sovereign.  Certain legal consequences directly follow from this.  For example, no
        action of the parties can confer subject-matter jurisdiction upon a federal court.  Thus, the
18      consent of the parties is irrelevant, principles of estoppel do not apply, and a party does
        not waive the requirement by failing to challenge jurisdiction early in the
19      proceedings......'[T]he rule, springing from the nature and limits of the judicial power of
        the United States is inflexible and without exception, which requires this court, of its own
20      motion, to deny its jurisdiction, and, in the exercise of its appellate power, that of all
        other courts of the United States, in all cases where such jurisdiction does not
21      affirmatively appear in the record.'" 456 US, at 702.
        Previously, the Court had stated in **Jones v. United States**, 137 US 202, 11 S.Ct. 80
22
23  (1890), as follows:

24          "All courts of justice are bound to take judicial notice of territorial extent of jurisdiction
        exercised by government whose laws they administer, or of its recognition or denial of
25      sovereignty of foreign power, as appearing from public acts of legislature and executive,
        although those acts are not formally put in evidence, nor in accord with pleadings."

In **Hanford v. Davis**, 163 US 273, 16 S.Ct. 1051 (1896), the Court stated:

"There is no presumption in favor of jurisdiction, and the basis for jurisdiction must be affirmatively shown."

In **FW/PBS, Inc. v. DALLAS**, 493 US 215, 107 L Ed 2d 603 (1990), the Court quoted the following:

"The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.' **Allen v. Wright**, 468 US 737, 750, 82 L Ed 2d 556 (1984).

'[E]very federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review, "even though the parties are prepared to concede it. ...."And if the record disclosed that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it."' **Bender v. Williamsport Area School Dist.**, 475 US 534, 541, 89 L Ed 501 (1986)", 107 L Ed 2d, at 621-22.

The above cases from the various federal courts set forth the inflexible rule that in criminal prosecutions, the United States, as the party seeking to establish the existence of federal jurisdiction, must provide certified evidence of territorial and subject matter jurisdiction.

For territorial jurisdiction authority the United States must prove ownership of the property (situs) where the alleged offense occurred, state cession of jurisdiction authority over the property to the United States, and acceptance of such jurisdiction authority by the United States as per **Title 40 USC § 255**.

Subject matter jurisdiction authority is normally provided the court by a lawfully enacted Congressional USC statute of either an "Act of Congress" or a "Law of the United States" as identified at **Title 28 USC § 1366**. The difficult Article III requirement for a Citizen of a Sovereign State of the Union is to require the court to provide evidence of legislative (subject-matter) jurisdiction authority over the accused, which is addressed later in these Points and Authorities.

STATE DECISIONS REGARDING FEDERAL JURISDICTION