1   Q.        There's actually quite a few magazines --

2   A.        Yes.

3   Q.        -- correct?

4   A.        Several.

5   Q.        And did you enclose your annual statement for

6   1990 -- 1989 to each of these publications?

7   A.        Yes, I did.

8   Q.        For what purpose?

9   A.        Well, I was operating out of my home at this

10  point in time, and I wanted to broaden my research

11  base and broaden my research and make it available to

12  people outside the Hawaii.  And I felt that the best

13  way to do that would to be share with the world what I

14  was doing and what I had done and what I had

15  accomplished at this point in time.  And so I offered

16  these to different magazines and publications for

17  publication.

18           MS. PANAGAKOS:  Your Honor, move to introduce

19  Exhibit 1090.

20           THE COURT:  I don't believe this is

21  admissible.

22           MS. PANAGAKOS:  It goes to open advocacy.

23           THE COURT:  It's one thing to send letters to

24  the IRS, another thing to send to a bunch of editors.

25           MS. PANAGAKOS:  It's going to our open

**EXHIBIT 6**

1  advocacy defense under Caldwell.

2          THE COURT:  This is not something the witness

3  relied on.  This is something he wrote.

4          MS. PANAGAKOS:  Right, Your Honor.  I believe

5  it goes to open advocacy under Caldwell and to the

6  First Amendment defense.

7          THE COURT:  I don't believe it's admissible.

8          MS. PANAGAKOS:  Thank you, Your Honor.

9  Q.      (BY MS. PANAGAKOS):  In 1990, were you

10  indicted for criminal charges?

11  A.      Yes, I was.

12  Q.      And what were those criminal charges?

13  A.      Seven counts of drug money laundering.

14  Q.      Did you have any history of drug use or drug

15  trafficking or anything like that?

16  A.      No.

17  Q.      And it was a grand jury indictment?

18  A.      Yes, it was.

19  Q.      Was it in this district?

20  A.      Yes, it was.

21  Q.      Who was the prosecutor?

22  A.      Lelsie Osborne.

23  Q.      And what office investigated the case?

24  A.      The U.S. Attorney's Office here in Hawaii.

25  Q.      And what about the IRS CID office?

1    A.        Yes, they were involved in the case.

2    Q.        Same office as Chuck Banfe?

3    A.        Yes.

4    Q.        Same office as Jason Pa?

5    A.        Yes.

6    Q.        And was Alexander Silvert, the first

7    assistant public defender, representing you in that

8    case?

9    A.        Yes, he was.

10   Q.        And the indictment was in 1909?

11   A.        Yes.

12   Q.        And the trial was in 1992?

13   A.        That's correct.

14   Q.        What was your defense in that case?

15   A.        It was an entrapment defense.

16   Q.        Can you explain to the jury what -- what was

17   argued on your behalf, in terms of entrapment?

18            MR. BAILEY:  Objection, Your Honor.

19   Relevance.

20            THE COURT:  Counsel, I don't understand why

21   we're going into this.

22            MS. PANAGAKOS:  Your Honor, at that trial

23   Mr. Silvert, in Mr. Hardy's presence and on behalf of

24   Mr. Hardy, argued that Mr. Hardy's advocacy was not

25   criminal and that his failure to file was not

1  criminal.  It's a crucial part of the --

2          THE COURT:  Well, so what --

3          MS. PANAGAKOS:  It's a crucial part of the --

4  It's a crucial part of the basis for his belief

5  system.  Chuck Banfe, Jason Pa testified at that

6  trial.

7          THE COURT:  He was not charged with this, and

8  that was that case.

9          MS. PANAGAKOS:  It was -- it was his defense,

10  Your Honor, and it's a major foundation for his belief

11  system.  Everything that happened for those two years,

12  which are during the course of the con --

13          THE COURT:  You're saying that; he is not.

14  You are testifying; he's not.  Now --

15          MS. PANAGAKOS:  But if I'm permitted to ask

16  the questions, he will say that.

17          THE COURT:  Well, you may ask the next

18  question.

19  Q.      (BY MS. PANAGAKOS):  Did Mr. Silvert argue to

20  the jury that your advocacy was not criminal?

21  A.      Yes, he did.

22          THE COURT:  Just a minute.  That is an

23  objectionable question, what his lawyer argued to the

24  jury.

25          MS. PANAGAKOS:  It -- Your Honor --

1          THE COURT:  First of all, it's rank hearsay.

2   And what is the purpose for which you're offering it?

3   The fact that his lawyer said?

4          MS. PANAGAKOS:  It's offered under Powell as

5   foundation for his good-faith belief.  He relied on

6   his experiences during this two-year period, which was

7   a critical time, and it's allegedly during the course

8   of the conspiracy that's alleged in the indictment.

9          THE COURT:  The argument made by his lawyer

10  to that jury is not something that he could rely on.

11  Q.        (BY MS. PANAGAKOS):  Was the defense that was

12  presented that you were entrapped because of --

13         THE COURT:  Counsel, I want to stop going

14  into this case.  It has nothing to do with this case.

15         MS. PANAGAKOS:  Can I ask if --

16         THE COURT:  Do you understand me?

17         MS. PANAGAKOS:  Your Honor, may I make a

18  proffer of what it would be?

19         THE COURT:  You have already done that.

20         MS. PANAGAKOS:  Well, there's more, Your

21  Honor.  Agent Banfe testifies the first time he's

22  actually responded.

23         THE COURT:  And you're going to tell us what

24  he testified to?

25         MS. PANAGAKOS:  The testimony is part of the

1    foundation for Mr. Hardy's good-faith belief, Your

2    Honor.

3              THE COURT:  I will not permit it.

4    Q.        (BY MS. PANAGAKOS):  Did your experiences

5    during the period 1990 through 1992 form part of the

6    basis for your belief system?

7    A.        It probably formed the most important part.

8              THE COURT:  Well, you had formed this belief

9    back in 1984.

10             THE WITNESS:  But this solidified it, Your

11   Honor.

12             THE COURT:  Well, but you didn't form it

13   because of what you heard at that trial.

14             Now, you've already told us chapter and verse

15   all of the things you relied upon to form this belief

16   predating that time by ten years.

17             THE WITNESS:  Okay.

18             THE COURT:  So that is why I do not believe

19   that that is part of the reliance.

20             MS. PANAGAKOS:  It's qualitatively different,

21   Your Honor, because of the result of the case.

22             THE COURT:  It is not.

23   Q.        (BY MS. PANAGAKOS):  Okay.  So you testified

24   that in about the early '90s you started the coloring

25   parties?

1    A.        Yes, I did.

2    Q.        And can you tell us about the coloring

3    parties?

4    A.        We had three to four parties every single

5    week at the Foundation.  And the purpose of the

6    coloring parties was to build -- to allow the members

7    to come to the foundation and talk about the different

8    issues in an open forum, and also to learn how to

9    color cartoons and to learn how to tab their code

10   books, their law books, their dictionaries and the

11   different things, and the schoolings and the teachings

12   that I was teaching them.

13   Q.        And at the seminars, do you encourage people

14   to do their own research?

15   A.        Absolutely.

16   Q.        And tell us how you emphasize that.

17   A.        Well, when they purchase the materials from

18   the Research Foundation, we provide them with Internal

19   Revenue Code books, law dictionaries, Webster's

20   dictionaries, IRS publications.  And I encourage them

21   to tab each one of these books meticulously and look

22   up all the definitions to make sure they understand

23   the definitions of all the sections, and understanding

24   of all the words.

25             THE COURT:  Let's take our afternoon recess

 1   at this time.

 2              THE CLERK:  All rise.  Jurors, right this

 3   way, please.

 4              (Jury excused.)

 5              THE COURT:  This reliance defense that you're

 6   relying on in this case permits a defendant to claim

 7   that he formed the belief which is the basis for the

 8   prosecution based on his research and whatever else it

 9   is.

10              It is not to permit you to introduce into

11   this case everything this witness ever did in his

12   lifetime or every experience he ever had under the

13   rubric that he relied on it.  That is pure nonsense.

14              You go looking for every favorable or

15   prejudicial fact that you can find and say, well, he

16   relied upon it.  This witness has already told this

17   jury he first believed this as a result of what his

18   father told him, when he was working in his bakery.

19              And then he recited ten years of additional

20   evidence that he relied upon; so that this trial that

21   he relied on, all you're trying to do is inject that

22   trial into this case for some purpose of your own.

23   Maybe to get the result that he was not found guilty

24   or to -- or to say that it was some kind of a

25   malicious prosecution aimed at -- that's what I

1    conclude from what you're trying to do here.

2         I do not believe this is a legitimate use of

3    the good-faith reliance defense.  That is why I did

4    not permit you to go into that --

5         MS. PANAGAKOS:  Well --

6         THE COURT:  -- any more than you did.

7         MS. PANAGAKOS:  I'm also --

8         THE COURT:  I don't want you to respond.  I'm

9    explaining it to you.

10        MS. PANAGAKOS:  I just want to make my record

11   that I'm offering it for two additional purposes, Your

12   Honor.  One is that under Caldwell, open advocacy is

13   -- defeats the element of deceit and dishonesty.

14        Mr. Silvert, on behalf of Mr. Hardy, in a

15   courtroom full of IRS agents, went through openly

16   everything that he was doing.

17        THE COURT:  That's already in evidence.

18        MS. PANAGAKOS:  Also, Your Honor, I believe

19   that the evidence, if it allowed to come in, would

20   support the defense theory of entrapment by estoppel,

21   reliance of an official on -- government officials,

22   under Raley versus Ohio, Cox versus Louisiana, United

23   States versus Clegg, United States versus Tallmedge.

24        Mr. Banfe testified in front of Mr. Hardy

25   that despite tax liabilities exceeding 300,000 they

1    didn't believe they could prosecute him; and he

2    testified there's a such a thing as a good-faith

3    defense.  And I believe that's absolutely critical to

4    solidify the belief --

5                    THE COURT:  That was long after he formed his

6    opinion that filing was voluntary.

7                    MS. PANAGAKOS:  He's charged with insincerely

8    believing this all the way to 2002.  He was here in

9    this courtroom for three years --

10                    THE COURT:  Well --

11                    MS. PANAGAKOS:  -- during the conspiracy.

12                    THE COURT:  -- we're not --

13                    MS. PANAGAKOS:  I believe it's critical.

14                    THE COURT:  You've made your record, counsel.

15                    MS. PANAGAKOS:  Thank you, Your Honor.

16                    THE COURT:  It will not be permitted.

17                    MS. PANAGAKOS:  Thank you, Your Honor.

18                    THE CLERK:  All rise.

19                    This court will be in recess until 3:00 p.m.

20                    (Break was taken.)

21                    THE CLERK:  All rise.

22                    This court is now in session.  Please be

23    seated.

24                    (In open court without the jury.)

25                    THE COURT:  I want to reacquaint counsel with

1    Rule 403, the Federal Rules of Evidence, which is

2    basis for my decision in the last excluding.  I want

3    to read it to you.

4            "Relevant evidence may be excluded if its

5        probative value is substantially outweighed by

6        the danger of unfair prejudice, confusion of

7        the issues, misleading the jury, or by

8        considerations of undue delay, waste of time,

9        or needless presentation of cumulative

10        evidence," all of which apply in this case.

11        I let you get some of this evidence in from

12    the trial.  I don't want the government to be trying

13    to rebut every inference and every suggestion that was

14    made as the result of that evidence.

15            In other words, I don't want to start

16    presenting evidence that other things were said about

17    tax liability that this man heard, other than what he

18    says he relied upon.  I don't want to have a mini-

19    trial on what took place in the other trial, because

20    it's, in my view, it is a needless waste of time.

21    This witness has presented plenty of evidence of

22    reasons for his beliefs, and this does not add any

23    more.

24            There is no serious question that he had a

25    public advocacy of this.  I mean, it is not even in

1    dispute.  He's holding these seminars all over -- he

2    had newspaper articles written about what he was

3    doing, and so forth.  So that, that is not -- there is

4    no need for any further evidence of that when it is

5    not a disputed fact.  You unders --

6         So these are the reasons that I don't believe

7    we go in this evidence regarding the other trial.  I'm

8    not inviting any response.  Bring the jury in.

9         MR. EDWARDS:  Judge?

10        THE COURT:  Yes.

11        MR. EDWARDS:  Just before you bring the jury,

12   I want to remind you that tomorrow morning I've got to

13   argue before the 9th Circuit, first thing.

14        THE COURT:  At what time?

15        MR. EDWARDS:  It's at nine o'clock.  It's up

16   on Bishop Street.  I hope they'll be done by 10:00,

17   but I can't control them.  I'm No. 4 on the nine

18   o'clock docket.

19        THE COURT:  Have you asked for any priority?

20        MR. EDWARDS:  I will in the morning.  That's

21   the best I can do.  And as soon as I get there, I will

22   ask for priority.

23        THE COURT:  But --

24        THE CLERK:  Judge, he had sent you a letter.

25   Remember I had faxed it?

1          MR. EDWARDS:  I wrote you a letter about it.

2          THE COURT:  Well, yes, I know you mentioned

3     it before.  But my advice to you is:  Finish fast.

4          MR. EDWARDS:  I just --

5          THE COURT:  Make it brief.

6          MR. EDWARDS:  I know you're going to talk to

7     the jury, and I just wanted to remind you.

8          THE COURT:  Well, we may have you reconvene

9     at 10:00 tomorrow.

10          MR. EDWARDS:  That, that -- I hope I'll get

11     here before 10:00.

12          THE COURT:  Well --

13          MR. EDWARDS:  Wish me luck.

14          THE COURT:  If not, we'll send the marshal

15     out.

16          MR. EDWARDS:  Okay.  1132 Bishop Street,

17     Judge, third floor, ninth -- sixth floor, I think.

18          THE COURT:  Are you the appellant?

19          MR. EDWARDS:  Yes, one of them.  There are

20     two of us.

21          THE COURT:  Well, that means you lost once.

22          MR. EDWARDS:  No.  Actually, this time this

23     is -- we won once and we're -- this is an interlock.

24          THE COURT:  Oh, all right.  Let's bring the

25     jury back.

1          THE CLERK:  All rise for the jurors.

2          (Jury enters.)

3          THE CLERK:  Please be seated.  This court is

4    now in session.

5          THE COURT:  I would like the jury to know

6    that our clerk, Leslie, was honored today at a

7    luncheon for 30 years of continuous service.

8          (Jury applauding.)

9          THE CLERK:  You're embarrassing me.

10         THE COURT:  She has been working here ever

11   since she was released on parole.

12         THE CLERK:  Thank you.

13         THE COURT:  All right.  Let's proceed,

14   counsel.

15                    DIRECT EXAMINATION (Continued)

16   BY MS. PANAGAKOS:

17   Q.      LaMarr, before this case here, were you ever

18   previously charged with any tax crimes?

19   A.      No.

20   Q.      You recall at the beginning of the trial

21   seeing the excerpts of the video seminar that the

22   government played?

23   A.      Yes, I do.

24   Q.      How representative is that of the entire

25   seminars?

1    A.        It's not a representation at all.

2              THE COURT:   What was the question?   How

3    representative is it of what?

4              MS. PANAGAKOS:   Of the entire seminar.

5    Q.        (BY MS. PANAGAKOS):   Do you have many, many

6    videos of seminars?

7    A.        Yes, I do.

8    Q.        Do you continue to give seminars now?

9    A.        Yes, I do.

10   Q.        Can you give the jury a flavor for your, you

11   know, at least opening statement as to why it's

12   voluntary?

13   A.        Well, it's voluntary because the Internal

14   Revenue Service says so.   I have a library of

15   publications, binders and binders of IRS publications

16   that I've researched over the years, where the IRS

17   admits in their own publications that filing and

18   paying taxes is voluntary.

19   Q.        And is this the information you share with

20   your -- the attendees at the seminar?

21   A.        Yes, it is.

22   Q.        When a client, when a prospective client

23   calls you, can you explain the process?

24             What's the first thing that happens when you

25   get an initial inquiry?

1    A.        Usually I talk to them about who they are,

2    what they are, and what they're doing.  And I usually

3    offer them a booklet, which I call "The Freedom

4    Booklet."  I tell them I'll send them a booklet.  And

5    if they still feel after reading the booklet that

6    they're interested in the program, that they can call

7    me back.

8              MS. PANAGAKOS:  May I show the court and the

9    witness Hardy Exhibit 1000?

10   Q.        (BY MS. PANAGAKOS):  And can you identify

11   that?

12   A.        Yes.  This is the -- the freedom booklet that

13   I would send to a prospective customer.

14             MS. PANAGAKOS:  Your Honor, I move to

15   introduce Exhibit 1000.

16             MR. BAILEY:  Objection, Your Honor, insomuch

17   as it's hearsay.

18             THE COURT:  Well, I think it's admissible.

19             MR. BAILEY:  All right.

20             THE COURT:  Because there had been issue

21   raised about the manner in which these seminars were

22   conducted; and in the allegations of conspiracy, this

23   is relevant and the jury may consider it.

24             MR. BAILEY:  Yes, Your Honor.

25             THE COURT:  It's admitted.

1           MS. PANAGAKOS:  Thank you.

2    Q.         (BY MS. PANAGAKOS):  Can you give me a flavor

3    of what's in the booklet?

4    A.         Lots of cartoons.  It has a picture of

5    myself.  It has Supreme Court cases that I've relied

6    upon in my decision-making.  It has the mission of the

7    Internal Revenue Service and, of course, the mission

8    of the Research Foundation.

9           It has a newspaper clippings of articles that

10   have been written about me all across the country.  It

11   has, obviously, pictures of presidents and what

12   they've said about the income tax.  It has referral

13   letters from different -- from people who have

14   actually taken my seminars.

15          THE COURT:  This is in evidence, and the

16   witness need not describe what it contains.

17          MS. PANAGAKOS:  Okay.

18   Q.         (BY MS. PANAGAKOS):  Do your materials

19   contain a disclaimer?

20   A.         Yes, they do.

21   Q.         And can you describe the disclaimer?

22   A.         It's on the back of the booklet.  And this

23   disclaimer tells people that I'm not an attorney and

24   that I can't advise them one way or another whether

25   they should file or not file; and that if they look at

1  this material, that they should seek their own

2  independent, competent counsel to review this material

3  before proceeding, with me.

4  Q.        It seems an awful long time to research the

5  same topic.  Why do you continue, continue?

6  A.        Well, every single year the Internal Revenue

7  Service and Congress change the rules.  So every

8  single year we get a brand-new code book, and we

9  exhaustively study that code book and see if any of

10  the new rule changes of the thousands of lines of code

11  that they add affect our position.

12        MS. PANAGAKOS:  May I show the witness

13  Government Exhibits -- I mean Hardy Exhibits 1035 --

14  1034, 1035, and 1050?

15        THE CLERK:  That's in the big books?  Okay.

16        MS. PANAGAKOS:  Your Honor, before the recess

17  there were some of the letters from -- that Mr. Hardy

18  had previously testified about that I neglected to

19  admit.  There were 1075, 1076, 1079, and 1080, the

20  Kailing letters and the Sherwood Rodrigues letters.

21        THE COURT:  Did we admit those?

22        MS. PANAGAKOS:  There was a question as to

23  1075 and 1076.

24        THE COURT:  Well, if they're the ones he

25  testified about --

1          MS. PANAGAKOS:  Yeah.

2          THE COURT:  -- they may be admitted.

3          MS. PANAGAKOS:  Thank you, Your Honor.

4          THE CLERK:  Judge, we only have one copy of

5    these.  Would you like to just --

6          THE COURT:  No.  I've read it.

7          THE CLERK:  Thank you.  Thank you, Your

8    Honor.

9    Q.        (BY MS. PANAGAKOS):  Okay.  What are these

10   exhibits, LaMarr?

11   A.        These books are the books that I order every

12   single year from a company that I acquire the code

13   books from.

14   Q.        And is it tabbed?  Can you --

15   A.        Yes.  These are the -- the actual tab kits

16   that I provide all my students with.  This was way

17   back in '85.  It's one of the beginning ones of my...

18             And this is almost like our workbook that we

19   work at all our tab kit tabbing parties.

20   Q.        And who decided what words to tab?

21   A.        Well, from all the research that I've done

22   and from all the professional opinions that I've

23   acquired, in those professional opinions the

24   professionals in -- the attorneys in there recommended

25   for me to look up these sections.

1           So all the sections that the attorneys told

2    us to look up, we actually created tabs for all of

3    those.

4    Q.       And what's the purpose for sharing the tab

5    kits with your students?

6    A.       Well, I want them to understand exactly what

7    this book is, what it says.  Especially the definition

8    sections.  And the best way to do that is to go

9    through the entire code, tab those sections, highlight

10   them.  And then when you read the code, then it takes

11   on a whole other meaning.

12           MS. PANAGAKOS:  I move to introduce those

13   three code books, Your Honor.

14           THE COURT:  They may be admitted.

15           MS. PANAGAKOS:  Thank you.

16   Q.       (BY MS. PANAGAKOS):  So you've heard

17   testimony from some witnesses here who didn't read the

18   materials?

19           THE COURT:  What?

20           MS. PANAGAKOS:  He -- I said --

21           THE COURT:  Leave out the preamble.

22           MS. PANAGAKOS:  Okay.

23           THE COURT:  Just ask questions.

24   Q.       (BY MS. PANAGAKOS):  Did you ever encourage

25   people not to read the materials?

1    A.        No.  I always encourage people to thoroughly,

2    exhaustively study the materials.

3    Q.        Did you ever talk to anyone about making up a

4    belief system?

5    A.        Absolutely not.

6    Q.        Are the materials that you sell accurate?

7    A.        Yes, they are.  They're government

8    publications.

9    Q.        And in the updates, the articles that you

10   publish, are they accurate reproductions of other

11   articles?

12   A.        Yes, they are.  The only thing I add to them

13   is cartoons.

14   Q.        Okay.  So a customer calls, you send the

15   booklet?

16   A.        Yes.

17   Q.        What happens next?

18   A.        Well, usually when I send out a booklet, it

19   isn't more than a few days, sometimes a week, and I

20   get a return phone call from that specific client;

21   just really excited about what they've just read, and

22   they want to know what the next step is and how fast

23   they can get involved in the foundation.

24   Q.        And so do you then -- is there another round

25   of material that you send out?

```
 1   A.        Yes.   Inside the booklet itself there is an

 2   application to acquire what I call "The Next Step."

 3   This is a copy right here (indicates).  And they can

 4   order The Next Step, which is be -- three of my

 5   videos, which are my actual seminars, which consist

 6   about six hours of material.

 7            There's also a reliance defense booklet.

 8   Actually, it's actually a manual now.  It jumps up.

 9   And it goes into much more depth about this particular

10   type of program here, and what it encompasses, what

11   they can actually acquire from the Research

12   Foundation, should they choose to join, and, you know,

13   what the responsibilities are as a member.

14   Q.        And the six-hour video that -- so that's the

15   next package --

16   A.        Yes.

17   Q.        -- is the six-hour video and the reliance

18   defense booklet?

19   A.        Yes.  Actually, it's a manual.

20   Q.        Manual?

21   A.        It's about this thick (indicates).

22   Q.        Okay.  And the six-hour video?

23   A.        Yes.

24   Q.        What's that?

25   A.        Well, this is the video that I market.  It's
```

1    an all-day seminar.  I've taken out, condensed it down

2    from eight hours to six hours.  Took in all the breaks

3    out, and I condense it down to three tapes.  And, of

4    course, the government has shown 25 minutes of a six-

5    hour video.

6    Q.      They've shown -- that was a different video,

7    if you recall.

8    A.      Oh.

9    Q.      That was the video from Mr. Benson that they

10   received.

11   A.      Very similar, though.  It's almost an

12   identical material.

13   Q.      And the six-hour video, is that -- have you

14   looked at that in my office, as marked as defense

15   Exhibits 1140, 1141, and 1142?

16   A.      Yes, I have.

17   Q.      And did you go over that with me to select

18   excerpts?

19   A.      Yes, I did.

20   Q.      And is that in the process of being made

21   right now?

22   A.      Yes, it is.

23   Q.      And it's going to be available tomorrow

24   morning?

25   A.      Yes, it is.

1    Q.        And do those excerpts fairly depict the

2    excerpts that it's reflecting?

3              Does it accurately depict the excerpts that

4    we've selected from the video?

5    A.        The excerpts are there.

6    Q.        Okay.

7    A.        But the context of the entire seminar is

8    diluted by not seeing the whole, entire thing.

9    Q.        So if you had your preference, you would

10    show --

11    A.        I would prefer the jury see the whole six

12    hours.

13              MR. BAILEY:  Objection, Your Honor, on the

14    defendant's preference.

15              THE COURT:  Counsel, you have to speak up if

16    you're going to make an objection, or use the

17    microphone so I can hear it.

18              MR. BAILEY:  Yeah, objection to the

19    defendant's preference as irrelevant.

20              THE COURT:  His what?

21              MR. BAILEY:  His preference on what he'd like

22    to show the video.

23              THE COURT:  Well, that is irrelevant.

24    Q.        (BY MS. PANAGAKOS):  Okay.  Do you believe it

25    would be more accurate to show the whole video?

1            THE COURT:  Well, first of all, does the part

2    of the video that was shown correctly reflect the

3    message that you try to impart to your clients?

4            THE WITNESS:  Is that a question from you?

5            THE COURT:  Yes.

6            THE WITNESS:  Okay.  I don't believe it

7    does.  I think they should see the whole thing.

8            THE COURT:  And what is there missing from

9    it?  What other?

10            THE WITNESS:  They're missing six hours of

11    the message, which tie it all together so that they

12    can fully understand and comprehend exactly who I am

13    and what I'm doing.

14            THE COURT:  Well, that's a generality.

15    Unless you can specifically state why this is

16    misleading or incomplete --

17            THE WITNESS:  Well, Your Honor --

18            THE COURT:  First of all, I'm not -- I don't

19    know why I'm in this discussion with you.

20            What is your question here?

21            MS. PANAGAKOS:  Well, Your Honor, tomorrow

22    morning we would like to offer our excerpts of the

23    video.  They're just not ready right now.  But

24    we've -- we've got the six hours.  That would be what

25    we believe would be the most accurate depiction of the

1  whole thing.  But we have selected excerpts that we'd

2  like to present to the jury tomorrow morning.

3          THE COURT:  Well, I mean, if there are parts

4  that need to be presented in order to give the

5  accurate -- what you believe to be a more accurate

6  meaning, I will permit that.

7          But I don't want a lot of gingerbread playing

8  on that.  That really tells us nothing.  Which, you

9  know, some of that stuff happens at these seminars.

10          THE WITNESS:  Not at my seminar, Your Honor.

11  No gingerbread.

12          THE COURT:  You've seen this tape?

13          THE WITNESS:  Lynn?

14          THE COURT:  You edited it?  I guess you saw

15  the whole tape.

16          MR. BAILEY:  We've seen the tape that we took

17  excerpts from.  It was a shorter tape.  I understand

18  there's maybe a three-hour tape that's there.

19          MS. CONNORS:  (Confers off the record.)

20          THE COURT:  She's talking about six hours.

21          MR. BAILEY:  Yeah, that -- we haven't seen

22  the six-hour tape.

23          THE COURT:  You haven't?

24          MS. PANAGAKOS:  I provided it to them in

25  January, Your Honor.

1           THE COURT:  Well --

2           MS. CONNORS:  We have it, Your Honor.

3           THE COURT:  -- maybe they didn't watch it.

4           Did you get it in January?

5           MS. CONNORS:  We have the -- I think we have

6    the six-hour tape that they're talking about.  The

7    excerpts came from a three-hour tape.

8           THE COURT:  Well, maybe you'd better look at

9    it so that you can comment on this request.

10          MS. CONNORS:  Sure, Your Honor.

11          THE COURT:  Let's go on with the questioning

12   here --

13          MS. PANAGAKOS:  Okay.

14          THE COURT:  -- if you have further questions.

15          MS. PANAGAKOS:  Okay.

16                   DIRECT EXAMINATION (Continued)

17   BY MS. PANAGAKOS:

18   Q.      So the prospective client calling after

19   getting the freedom booklet then would receive the

20   six-hour video and the --

21   A.      -- reliance defense manual.

22   Q.      Okay.

23          MS. PANAGAKOS:  And can I show the court and

24   Mr. Hardy Exhibit 1002?  I'm sorry, 1001.

25   A.      Yes, this is the reliance defense manual that

1    --

2    Q.         (BY MS. PANAGAKOS):   Okay.  So how does that

3    expand upon what the first series of materials were?

4            THE COURT:  Well, is this something you

5    provide to your clients who subscribe to it?

6            THE WITNESS:  No, this is an introductory.

7    This is the first introductory.  I want my client --

8            THE COURT:  Is this sent to people who pay

9    for participation in your program?

10            THE WITNESS:  Yes, this would be like a Phase

11    2.  This is an introductory to who we are.

12            THE COURT:  All right.  You've answered the

13    question.

14    Q.         (BY MS. PANAGAKOS):  So can you identify the

15    key materials that are added to this new --

16    A.         Well, now we're basically introducing the

17    actual reliance defense, and there's a chapter on

18    "What is a reliance defense?"  A lot of people don't

19    know that.  It's a kind of a new term.

20            THE COURT:  Well, we heard witnesses here

21    testify they purchased the reliance defense manual, or

22    the reliance defense program.  Is this what they were

23    given then for that as a -- for the client?

24            THE WITNESS:  Yes.  This -- this would be the

25    actual booklet, or manual that would be sent to them

1   when they ordered it.

2           THE COURT:  All right.  Do you wish to offer

3   this in evidence?

4           MS. PANAGAKOS:  Yes, I do, Your Honor.  Yes.

5           MR. BAILEY:  Objection.  Cumulative, Your

6   Honor.

7           THE COURT:  Overruled.  It may be admitted.

8   Q.      (BY MS. PANAGAKOS):  And then what happens

9   after a client receives this binder?

10  A.      Well --

11          THE COURT:  I didn't understand that last

12  objection.  Cumulative to your evidence?

13          MR. BAILEY:  Yes, Your Honor.  We have a --

14          THE COURT:  Well, that isn't --

15          MR. BAILEY:  And to --

16          THE COURT:  Cumulative applies only to one

17  party presenting cumulative evidence.  It does not

18  become cumulative because you presented some evidence

19  of it.

20          MR. BAILEY:  Well --

21          THE COURT:  This is the first she has

22  presented.

23          MR. BAILEY:  We have -- we have the -- I

24  think the booklet that was admitted --

25          THE COURT:  You may have another booklet --

1          MR. BAILEY:  -- a lot of the material

2     overlaps.

3          THE COURT:  -- that was submitted as evidence

4     in your part of the case?

5          MR. BAILEY:  I'm talking, I think the

6     introductory booklet that was admitted by the defense

7     just a little bit ago.

8          THE COURT:  Well, this, this was not --

9          THE WITNESS:  No.

10         THE COURT:  So this is received.

11         MR. BAILEY:  They're different materials.

12    Q.        (BY MS. PANAGAKOS):  And to the best of your

13    knowledge and ability, are these materials accurate?

14    A.        Yes, they are.  These are the materials that

15    goes over the history of who we are.  It goes over my

16    victories with IRS, my court victories with them.  It

17    goes over my clients' victories, testimonials, more

18    testimonials.  It gives them an overview of all the

19    materials they could acquire, should they choose to

20    want to become a member of the foundation.

21    Q.        And you give people a lot of research; don't

22    you?

23    A.        Well, I'm a research foundation.  That's who

24    I am.  That's what I do.  And I do research and I try

25    to provide accurate information, information that's

1    timely and information that might be pertinent to

2    their specific case.

3    Q.       And do you take care to provide complete

4    copies of documents to ensure against misleading

5    anyone?

6    A.       Absolutely.  All the documents in here are

7    complete, the complete articles.

8    Q.       So if a client then is -- continues to be

9    interested after getting the reliance defense basic

10   binder, or that reliance defense manual, is there a

11   next level of material that's presented?

12   A.       Well, what I tell them at this level is:

13   Watch the videos, the full six hours.  And review

14   this, extensively.  And if you still feel this is

15   something you want to proceed with, then "please call

16   me back."

17   Q.       And do you include disclaimers with all your

18   material?

19   A.       Yes, I do.

20            MS. PANAGAKOS:  And can I show the witness

21   Exhibit 1002?

22            THE CLERK:  You wanted 1002?

23            MS. PANAGAKOS:  Yes.

24            THE CLERK:  Okay.

25   Q.       (BY MS. PANAGAKOS):  Can you identify that?

1  A.        Yes.  This is what we call our basic binder.

2  Q.        So where is that in the series of materials

3  that you distribute?

4  A.        Well, at this point in time after they've

5  watched the videos, they've entirely reviewed this

6  entire manual and, if they're still interested, or

7  they're not scared away, and they've called me back

8  and they actually want to become a member of the

9  foundation, then we go over a proposal.  We go over

10  their personal situation.

11         And at that point in time, if they want to

12  continue with us, they would join the foundation.

13  When they joined the foundation, this basic binder

14  would be one of the basic binders that we would give

15  all the new students.

16  Q.        So what's the basic package?

17         So now someone enrolls.  What's involved in

18  that, or joining?

19  A.        To enroll, there would be a series of

20  questionnaires.  There would be a proposal, very

21  specific proposal based on their personal situation.

22         There would be other applications.  We'd call

23  it the legal defense fund.  There's other things in

24  that packet that they would go through, and I'd go

25  through that packet with them and discuss it with

1    them, on each level.

2         And if they want to join, then they could

3    fill all that information out, send whatever funds

4    necessary to acquire the next step, which would be the

5    actual personal foundation.

6    Q.       Okay.  And so this is part of the basic

7    binder?

8    A.       This is -- would be -- this would be the

9    beginning binder in what we call their personal

10   foundation.

11   Q.       Okay.

12   A.       We call it the basic binder.

13   Q.       And what's the contents of that?

14   A.       The basic binder goes over, again, the

15   reliance defense, so they understand that.  It goes

16   over all the key definitions of words that are built

17   into this code here.

18        It also goes into the three different

19   definitions:  The one that's inside the code, the one

20   that's inside the dictionaries, the Webster's, and the

21   Black's Law Dictionary; so they can see the three

22   distinct, different definitions.

23        This particular binder also has an entire

24   chapter on IRS publications that state that it's

25   voluntary.  It also has an entire chapter on

1    publications to state that it's mandatory.

2            So when the government wants to make

3    something mandatory, they know how to say it.  When

4    they want to make something voluntary, they know how

5    to say that, too.

6    Q.      So the section on "mandatory," that doesn't

7    include income tax then?

8    A.      No, it does not.

9    Q.      You mentioned dictionaries.

10           MS. PANAGAKOS:  Can I show the witness

11   Exhibits 1054, 1056, and 1058?

12           THE COURT:  This exhibit is given to these

13   clients who pay for it?

14           THE WITNESS:  Yes.  At this level of the

15   game, they've actually made a decision -- after we

16   tell them not to do it, several times -- to become an

17   actual member of the foundation.

18           THE COURT:  And they get this?

19           THE WITNESS:  This is one of the pieces.

20   They actually get a whole bunch of stuff.  This is one

21   small piece.

22           THE COURT:  This is part of it?

23           THE WITNESS:  This is part of it, yes.

24   Q.      (BY MS. PANAGAKOS):  What are the other

25   parts?

1  A.      The other parts would be court case

2  research.  They get several binders of that.  They

3  would get several monthly updates.  This is the

4  research I do on an annual basis.  They would get an

5  annual statement binder, which where they would

6  actually hold all their annual statements over the

7  years.

8  Q.      Meaning the statements to be sent to the IRS?

9  A.      Yes.

10  Q.      You mentioned court cases.  Can I show you --

11          MS. PANAGAKOS:  Well, first of all, can I

12  move to introduce 1002?

13          THE COURT:  That may be admitted.

14          MS. PANAGAKOS:  And I'd like --

15  Q.      (BY MS. PANAGAKOS):  And the dictionaries, do

16  you include dictionaries in the foundation?

17  A.      Yes.  We include not only the Internal

18  Revenue Code books, but we always include a Webster's

19  dictionary -- and this is an actual representation of

20  that -- with a tab kit.

21          We include a Black's Law Dictionary so they

22  can look up all the legal words, with a tab kit, so

23  that they can see the difference every single

24  dictionary has, all different definitions of all the

25  same words.

```
 1            But that -- that way, the student can now not
 2    only tab it, but we recommend a place to highlight.
 3    So they can highlight each one of them.  And then we
 4    recommend that they go to each book.  And we recommend
 5    that they go to each word in each book -- Internal
 6    Revenue Code, Black's Law Dictionary, and Webster's --
 7    and take a look at the definitions sections in each
 8    one of those, and look at the same words in each one
 9    of them.  And they invariably find every single
10    definition is entirely different in each and every
11    book.
12    Q.        And you discuss the definitions in your
13    seminars?
14    A.        Yes, I do.  In great detail.
15    Q.        And when you do that, do you accurately take
16    the definitions from the dictionary?
17    A.        Absolutely.
18    Q.        You don't misstate the definitions?
19    A.        No.  I give them copies so they can look it
20    up for themselves.  That's why I provide copies, so to
21    make sure it's accurate.
22            MS. PANAGAKOS:  I move to introduce 1034,
23    1035, 1050, 1054, 1056 and 1058, which are the code
24    books and the dictionaries.
25            MR. BAILEY:  The code books and the
```

```
 1    dictionaries lack probative value.  We have a running

 2    objection, at some point that's going to be

 3    cumulative.  And the --

 4              THE COURT:  Well --

 5              MS. PANAGAKOS:  -- materials that are put

 6    together are hearsay, offered to prove the truth of

 7    the --

 8              MS. PANAGAKOS:  They're not offered for its

 9    truth.

10              THE COURT:  Those exhibits will be received.

11              MR. BAILEY:  Thank you, Your Honor.

12    Q.        (BY MS. PANAGAKOS):  You mentioned court

13    cases?

14              MS. PANAGAKOS:  Can I show the witness --

15    Mr. Hardy and the court Exhibits 1003 and 1004?

16    Q.        (BY MS. PANAGAKOS):  So you mentioned court

17    cases.  I mean, in the course of your life, you had to

18    deal with a lot of lawyers, huh?

19    A.        Yes.  I have definitely done that.

20    Q.        And so you hear us all arguing about what

21    court cases mean?

22    A.        Yes.

23    Q.        And you argue about what these cases mean,

24    right?

25    A.        That's correct.
```

1          THE COURT:  Let's move these along here.

2          These are Exhibits 103 and 104 -- 1003 and

3     1004 have been placed before you.  Are these part of

4     the package of materials that is given to these people

5     that subscribe to your service?

6          THE WITNESS:  Yes, they are.  These are

7     court --

8          THE COURT:  You wish to offer these?

9          MS. PANAGAKOS:  Yes, I do, Your Honor.

10         THE COURT:  They may be admitted.

11         MS. PANAGAKOS:  Thank you.

12    Q.     (BY MS. PANAGAKOS):  And why do you give your

13    clients complete copies of court cases?

14    A.     Well, I want to make sure that when my

15    clients read it, the complete copy, that it's not

16    taken out of context.  So I provide the complete,

17    entire case, and I highly recommend that they read the

18    entire case and start learning and understanding how

19    the cases work.

20         THE COURT:  All right.  Let's not wander into

21    narratives here.

22    Q.     (BY MS. PANAGAKOS):  Do you encourage your

23    clients to form their own opinions based on this

24    research?

25    A.     Absolutely.  I encourage them to sign up with

1    West Law and the different law libraries, and go to

2    the library and look them up themselves.  As well as

3    find new cases.

4    Q.      Because -- do you tell them not to -- you

5    know, that you don't want them to just take your word

6    for it?

7            THE COURT:  Counsel, he's already answered

8    that question.

9            MS. PANAGAKOS:  Yes, Your Honor.

10   Q.      (BY MS. PANAGAKOS):  Are those cases accurate

11   reproductions of the actual court opinions?

12   A.      Yes, they are.

13   Q.      And over the years, do you continue to

14   consult with professionals?

15   A.      Yes, I do.  Every single year I try to -- I

16   try to acquire new professionals.

17   Q.      And have you ever drafted one of those

18   opinion letters yourself?

19   A.      No, I have not.

20   Q.      Have you ever disseminated opinion that was

21   not genuine and authentic?

22   A.      No, I have not.

23   Q.      Now, the reliance defense is a defense to

24   criminal charges; is that right?

25   A.      That's correct.

1    Q.        We've heard a fair amount about liens and

2    levies during the trial?

3    A.        Yes, you have.

4    Q.        Where does that fit in?

5    A.        Well, liens and levies, that's a civil issue.

6    Q.        So that's not really part of the reliance

7    defense?

8    A.        No, it's not.  It's a separate module, a

9    civil issue.  But we do offer civil remedies.

10   Q.        And is that where the bankruptcy thing comes

11   in?

12   A.        That would be one of the civil remedies.

13   Yes.

14   Q.        So tell us what you do with regard to

15   bankruptcies.

16   A.        Well, I have people call me every single day,

17   and have for years and years and years.  And they've

18   been brutally abused by the IRS:  By the IRS seizing

19   their property, seizing their paychecks.  Horror

20   stories, unbelievable.

21             And when I receive a client that has had his

22   paycheck seized, usually the IRS seizes the entire

23   paycheck and the client is devastated.  And he doesn't

24   have a way to feed his family, take care of his rent,

25   or whatever.  And so we've had to develop tools to

1    help solve some of those problems and be able to allow

2    that person to get back on his feet and handle, you

3    know, the remedies through the courts the proper way,

4    without being seized and everything frozen.

5                And I've utilized the bankruptcy --

6                THE COURT:  The question didn't call for this

7    type of answer.  I think she asked you about

8    bankruptcies.

9                THE WITNESS:  Mm-hmm.

10               THE COURT:  That does not require you to tell

11   us about the horror stories of people.

12               What do you do with people, or what advice do

13   you give to people relating to bankruptcies, and under

14   what circumstances do you give it?

15               THE WITNESS:  Good.  Very --

16               THE COURT:  That's what you need to answer.

17               THE WITNESS:  Okay, good.

18   A.      If a person comes to me and he hasn't filed

19   for many years -- because there's actually millions of

20   non-filers out there -- and the IRS has actually

21   seized his paycheck, the remedy, one of -- one of the

22   remedies is, is to try to lift the lien and try to be

23   able to give that person his life back.

24               Bankruptcy is a very wonderful tool that can

25   be used instantaneously to release the lien.

```
 1   Q.        (BY MS. PANAGAKOS):  So what --

 2             THE COURT:  If this witness doesn't answer

 3   the question directly, I'm not going to permit you to

 4   ask it again.

 5             I don't want you to tell us that bankruptcy's

 6   a wonderful tool.

 7             THE WITNESS:  Okay.

 8             THE COURT:  I asked you when you used

 9   bankruptcy or suggested it be used.  And that's all

10   you have to answer.

11             THE WITNESS:  Okay.

12             THE COURT:  And you've told us it's when

13   people's assets have been seized, or subject to

14   seizure, is when you advise that they file bankruptcy;

15   is that right?

16             THE WITNESS:  That could be one of the

17   remedies, yes.

18             THE COURT:  Well, she asked specifically

19   about bankruptcy.  That's the question.

20   Q.        (BY MS. PANAGAKOS):  When you have a client

21   who's interested in bankruptcy, what do you provide to

22   that person?

23   A.        We have a manual, very similar to one like

24   this (indicates), that goes over bankruptcy and how it

25   can be used to release liens and resolve IRS issues.
```

1    Q.        Do you help people with the forms?

2    A.        Usually I do not, because the forms are

3    included in the book.

4    Q.        Okay.  So you give the information to a

5    client so that they could do it themselves?

6    A.        What I recommend to them is I recommend for

7    them to go to their local Yellow Pages and try to find

8    a bankruptcy attorney in their area.  And if they can

9    find someone that specializes in tax issues with

10   dealing with bankruptcy, then I highly recommend that

11   they receive local counsel that can assist them in

12   their bankruptcy.

13   Q.        And what about local clients who are looking

14   for an attorney?

15   A.        Be the same thing.  I would recommend that

16   they get counsel.

17   Q.        And did you recommend Mr. Wallis to some of

18   your clients?

19   A.        Yes, I did.

20   Q.        Did you ever suggest to any client that they

21   make a false statement in the bankruptcy court?

22   A.        No, I have never have.

23   Q.        Have you ever made false statements to

24   your --

25   A.        Not that I'm aware of, no.

```
 1   Q.        The trusts that you offer clients, can you

 2   tell the jury how you first got involved in learning

 3   about trusts?

 4   A.        I read a book called "The Rockefeller Files,"

 5   back in 1984.  And it specifically went into --

 6             THE COURT:  Now, I don't think you were asked

 7   for this background that you're always introducing

 8   into this.  If she wants to know about that, she can

 9   ask.

10             What is specifically your question?  You ask

11   these general, ambiguous question; and then the

12   witness doesn't know what you're asking and he begins

13   this narrative.

14             Now, what is it you want to ask this

15   witness --

16             MS. PANAGAKOS:  I'd like --

17             THE COURT:  -- about these trusts?

18             MS. PANAGAKOS:  Well, first of all, his back-

19   ground knowledge in it, since he talks to -- you know,

20   there's been testimony about him talking to clients

21   about these trusts.  So I want to --

22             THE COURT:  But you didn't ask him back-

23   ground or knowledge.

24             MS. PANAGAKOS:  Okay.

25             THE COURT:  You just threw out a general
```

1    question about:  What about these trusts?  I don't

2    want those kind of questions.

3              MS. PANAGAKOS:  Yes.

4              THE COURT:  Be specific what facts you're

5    trying to elicit from this witness, and I think this

6    will move along better.

7    Q.        (BY MS. PANAGAKOS):  Okay.  Back in the 1980s

8    did you begin doing research on trusts?

9    A.        Yes, I did.

10   Q.        And what did you research?

11   A.        I was interested in trusts of the super-

12   wealthy, because they could be used to legally avoid

13   income taxes.  And also I was interested in estate

14   planning.  So I did an tremendous amount of research

15   on trusts.

16   Q.        And did you speak with attorneys about the

17   trusts?

18   A.        Yes, I did.  Here, locally, I looked in the

19   Yellow Pages under trusts, and I found a -- actually

20   several attorneys.  One in particular, his name was

21   Lou Nevels, Junior.  I called him up and told him that

22   I was researching trusts, and specifically the

23   Massachusetts business trust.

24              And he invited me out to his home, which he

25   had a law library inside the home, and he also had his

1    practice operating out of his home.  And he invited
2    me.  We got to talking, and I told him my sincere
3    desire to understand trusts and how they relate and
4    how they work.  And he offered to tutor me.  And he
5    spent a considerable amount of time with me,
6    personally.
7    Q.        And through your -- so did you continue to
8    research with him then?
9    A.        Yes, I did.  I was very specific in that I
10   wanted to create several tools for my clients, and for
11   specific reasons.  And he actually took me under his
12   wing and taught me everything he knew about trusts,
13   showed me the case law on them and actually helped me
14   develop very specific types of trusts for specific
15   issues that I could use with my clients.
16   Q.        And how old was he when you contacted him?
17   A.        I would say he was probably in his six --
18   late 60s.
19   Q.        Okay.  So between -- and in conjunction with
20   your work with Attorney Nevels, did you begin creating
21   trust documents?
22   A.        Yes, I did.  He assisted us in creating
23   several trusts that we could utilize for our clients,
24   depending on their specific needs.
25   Q.        So what do you mean, several trusts?

1    A.        Well, trusts are just a tool, and every

2    single client has different specific issues.  Some

3    have needs for holding assets.  Some have needs for

4    actually doing business.  There's lots of variables.

5            And so we developed a whole series of tools,

6    including corporations, LLCs, all different types of

7    entities that we could utilize, depending on what the

8    client's needs were.

9    Q.        And so through your work with Mr. Nevels, did

10   you actually create trust documents?

11   A.        Yes, we did.

12   Q.        And what kind?  I mean, what documents did

13   that include?  Would it be -- would there be a series

14   of documents?

15   A.        Yes, it would be a series of documents.  In

16   fact, it's an entire binder.  It would be a notice of

17   trust.  It would be the actual contracts that would be

18   used to create the trust instruments.  It would be an

19   actual binder of -- we did, I think, a hundred and

20   something minutes, sample minutes so that the trustees

21   and the people could look at the different issues and

22   have minutes available, or minutes they could draft,

23   but at least give them a starting point.

24            The trusts themselves had glossaries inside

25   them so that they could look up all the definitions

1   and every single word in the entire trusts in their

2   own dictionaries.  Very extensive work.

3   Q.        And so Mr. Nevels stood behind his work?

4   A.        He claimed he was one of the foremost experts

5   in this particular type of trust that we were looking

6   for.

7   Q.        So you relied on the information you learned

8   from him --

9   A.        Yes, I did.

10  Q.        -- and the work you did with him.

11            And did you also work with an attorney named

12  Paul Sulla?

13  A.        Yes, I did.

14  Q.        When did that start?

15  A.        That was about a year later.  I wanted to

16  always in my work, I always try to get second, third,

17  fourth opinions on the work that I'm doing.  And I --

18  this one particular type of trust, the Massachusetts

19  trust that I was studying, I figured it would be best

20  to go to Massachusetts and actually find an attorney

21  that specialized in the Massachusetts trust.

22            I call the Massachusetts bar, and I told them

23  that I was very interested in a trust lawyer who

24  understood about trusts, how they worked; and I wanted

25  to make sure that this particular trust lawyer

1  specifically understood how the Massachusetts-type

2  trust worked.

3  Q.        Why were you so interested in the

4  Massachusetts-type trust?

5  A.        Because in my research, this very specific

6  type of trust had tax advantages that I was interested

7  in.

8  Q.        And so did you call Mr. Sulla?

9  A.        Yes, I did.

10  Q.        And what happened?  What was the

11  conversation?

12  A.        I called him up and told him that I was

13  referred to him from the Massachusetts bar, that they

14  said that he was an expert in the specific areas that

15  I was interested in.  And he kind of chuckled and

16  said, "Yes, I am."

17            He had a law practice there, in Boston.  And

18  I told him exactly what I was looking for is an

19  attorney that I could correspond with and send him my

20  documents that I got from Mr. Nevels, and basically

21  review all the research that I've already done and

22  review all the instruments that -- kind of like

23  double-check everything, right?

24            And he said that he would be willing to do

25  that for me.

1    Q.       And did he?

2    A.       Yes, he did.  In fact, he did more than

3    that.  At the time I called him the second time, he

4    said that he was going to make travel plans to come

5    out here and actually personally meet me because he

6    was so intrigued with my desire to learn and

7    understand about the trust.  So --

8    Q.       Did he come out here?

9    A.       Yes, he did.

10   Q.       And did Mr. Sulla and you work together on

11   your trusts?

12   A.       Yes, we did.

13   Q.       And so was he involved in drafting some trust

14   documents that you have used in your foundation with

15   your clients?

16   A.       Yes.  The main instrument, one of the first

17   trusts we ever drafted was a trust called First

18   National Trust.

19   Q.       That's the trust where Mr. Terwilliger's the

20   trustee?

21   A.       Yes.  Paul drafted that entire trust.

22   Q.       And did he tell you it was a legal, valid

23   trust?

24   A.       Yes, he did.

25   Q.       And did you rely on that?

1    A.        Absolutely.

2    Q.        Now.  The -- we haven't seen you show up as a

3    trustee on these trusts.  Is there a reason for that?

4    A.        I have chosen not to be a trustee.

5    Q.        You don't want to assume those fiduciary

6    duties?

7    A.        No, I do not.

8    Q.        Were you involved in any way in the operation

9    of Dr. Honda's trusts?

10    A.        No, I was not.

11    Q.        Were you involved in the operation of any

12    trusts where Mr. Wallis was the trustee?

13    A.        No, I was not.

14    Q.        Were you involved in the operation of any

15    trusts where Mr. Penrose was the trustee?

16    A.        No, I was not.

17    Q.        Now, the First National Trust, that's the --

18    explain what that is.

19    A.        The First National Trust was to be basically

20    the cornerstone of an organization that I was to be

21    setting up.  It was basically the overall trust.  It

22    was designed by Mr. Sulla to receive funds from

23    different people and basically operate as the business

24    trust in the front of our organization.

25    Q.        And Mr. Terwilliger was the trustee?

1    A.        Yes.  Mr. Terwilliger was appointed as the

2    trustee of that trust.

3    Q.        And did you control Mr. Terwilliger's

4    actions?

5    A.        No, I did not.

6    Q.        Did the Research Foundation receive funds

7    from the First National Trust?

8    A.        Yes.  There was a secondary account opened up

9    for the Research Foundation.  The Research Foundation

10    was actually the generator, the main generator that

11    generated income for the trust.

12    Q.        So when the Research Foundation needed money

13    from the trust to cover expenses and operating costs,

14    how would the funds be -- what was the procedure for

15    disbursing the funds?

16    A.        Well, we had our own budget.  But a lot of

17    times, if we needed equipment or tools, like a copier,

18    running a business is lots of expenses.  And at that

19    point in time we were growing, growing and growing.

20    Q.        So what was the procedure to get the funds?

21    You couldn't write the check, right?

22    A.        No.  We sent a memo to Richard and asked him

23    if he would cut us a check for specific items that we

24    needed for our growth in the foundation.

25    Q.        And it was up to Richard whether to cut the